IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION
FILED UNDER SEAL—FILED UNDER SEAL—FILED UNDER SEAL

UNITED STATES OF AMERICA )
)
and )
)
COMMONWEALTH OF VIRGINIA )
) CASE NO. 3:13cv166
*ex rel* )
) COMPLAINT
Lisa Phipps, )
            *Plaintiffs,* ) JURY TRIAL DEMANDED
v. )
) FILED UNDER SEAL
Agape Counseling and )
Therapeutic Services, Inc. )
And )
Sherie Mawusi )
(in her individual capacity) )
And )
Lena Baker-Scott )
(in her individual capacity). )
            *Defendants.* )

**SEALED**

---

## COMPLAINT

Plaintiff Lisa Phipps, through her attorneys, on behalf of the United States of America

and the Commonwealth of Virginia, for her Complaint against defendants Agape Counseling and

Therapeutic Services, Inc., Sherie Mawusi, and Lena Baker-Scott, based upon personal

knowledge, alleges as follows.

## INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of

America and the Commonwealth of Virginia arising from false and/or fraudulent records,

statements and claims made, used, or presented and caused to be made, used or presented by

defendants, Agape Counseling and Therapeutic Services, Inc., Sherie Mawusi, Lena Baker-Scott and/or their agents, employees and co-conspirators, (collectively referred to as "defendants") to Medicaid and other state and federal programs in violation of the Federal Civil False Claims Act, 31 U.S.C. §3729 *et seq.* ("FCA"), and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.* ("VFATA"). Additional violations of the FCA and VFATA occurred when defendants unlawfully retaliated against relator.

2.      From at least 2009, and continuing until the present, defendants have violated the FCA and the VFATA by knowingly submitting, causing to be submitted, and conspiring to submit to Medicaid and other state and federal programs false claims for services provided by employees who were not qualified to perform these services, and by billing Medicaid and other programs for services that were not rendered.

3.      As a result of these violations, Defendants received multiple overpayments from the Virginia Department of Medical Assistance Services ("DMAS"). Defendants were aware, at all times, that the monies received for the above-mentioned false claims were overpayments, and defendants took multiple affirmative steps to avoid repaying the monies owed to DMAS. Thus, defendants also committed multiple violations of the VFATA and FCA when they failed to repay monies obtained by the aforementioned violations of state and federal law, and falsified documents and reports in order to conceal their unlawful acts and to conceal the overpayments wrongfully obtained.

4.      The violations of the anti-retaliation provisions of the Acts arise because Relator was harassed, discriminated against, and otherwise subjected to unlawful retaliation after she uncovered these violations and refused to participate in or remain silent about these violations of Virginia and federal law.

5.     Relator Ms. Phipps brings claims on behalf of the United States and the Commonwealth of Virginia pursuant to the *qui tam* provisions of the federal FCA and the VFATA, and seeks to recover all available damages, civil penalties, and other relief for state and federal violations by defendants as alleged herein.

## PARTIES

6.     Mrs. Phipps is an American citizen and resident of the Commonwealth of Virginia. Mrs. Phipps earned her Bachelor's degree in Social Work from Christopher Newport University in Newport News, Virginia and is in the process of getting her Master's degree in Social Work.

7.     Mrs. Phipps started working at Agape in May, 2006 and is currently a Director of Community Mental Health Services. She is one of eight directors and supervises a team of at least 30 employees who provide mental health care for adults.

8.     Mrs. Phipps has direct and independent knowledge of the matters disclosed herein; Mrs. Phipps is therefore an "original source" of the information contained herein. However, Mrs. Phipps states that to her knowledge the information contained herein has not been publicly disclosed.

9.     Defendant Agape Counseling & Therapeutic Services, Inc. ("Agape") is a Virginia Corporation with six offices located throughout the Hampton Roads area, including its headquarters located at 3321 Commander Shepard Boulevard, Hampton VA 23666. Agape employs hundreds of counselors, and has approximately $16 million in revenues per year.

10.     Agape offers mental health programs to the community, including: outpatient psychotherapy; substance abuse counseling; therapeutic day treatments; mental health support services for children and adults; and intensive in-home services.

11.     Agape has a Provider Participation Agreement with the Virginia Department of Medical Assistance Services ("DMAS"), and as such, Agape is responsible for ensuring that its community mental health programs meet the standards and requirements set forth by that Department.

12.     Defendant Sherie Mawusi is a licensed clinical social worker ("LCSW") and owner of Agape. Ms. Mawusi is the only licensed owner.

13.     Defendant Sherie Mawusi has the power to hire and fire individual employees of Agape, as well as the power and authority to control the corporation and its billing practices. Mawusi is involved in the false claims alleged herein, and is individually liable.

14.     Defendant Lena Baker-Scott is also an owner of Agape, and goes by the name "Shelly." Shelly is a Qualified Mental Health Professional ("QMHP"), but not a Licensed Mental Health Professional ("LMHP.")

15.     Defendant Lena Baker-Scott has the power to hire and fire individual employees of Agape, as well as the power and authority to control the corporation and its billing practices. Defendant Lena Baker-Scott is involved in the false claims alleged herein, and is individually liable.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

17.     31 U.S.C. §3732(b) specifically confers jurisdiction on this Court over the state law claims asserted in this Complaint. Under 31 U.S.C. §3730(e), there has been no public disclosure of the "allegations or transactions" in this Complaint.

18.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a).

Moreover, the defendants can be found, reside, or transact or have transacted business in the

Eastern District of Virginia.

19.     Venue is proper in the Eastern District of Virginia pursuant to 31 U.S.C. §3732(a)

because the defendants can be found in and transact or have transacted business in this district.

At all times relevant to this Complaint, defendants regularly conducted substantial business

within this district, maintained employees and offices in this district, and made significant sales

within this district.  In addition, statutory violations, as alleged herein, occurred in this district.

## ALLEGATIONS RELEVANT TO ALL COUNTS OF THE COMPLAINT
## APPLICABLE LAW
### The Federal Health Insurance Programs

20.     Medicaid is a jointly financed federal-state program established under Title XIX of the

Social Security Act, 42 U.S.C.A. §§ 1396-1396v.  Medicaid pays for necessary medical care to

certain needy individuals who do not have enough income or other resources to pay for the

medical care they need.  States choosing to participate in the Medicaid program must comply

with the requirements set forth in the Medicaid Act and with regulations promulgated by the

United States Secretary of Health and Human Services through the Center for Medicare and

Medicaid Services which administers Medicaid and other such programs.  See 42 U.S.C.A. §

1396a(a).

21.     Under Title 42 Code of Federal Regulations, Parts 455 and 456, a state's Medical

Assistance Program must provide for continuing compliance reviews of participating Medicaid

providers to ensure that the services provided to Medicaid members are medically necessary and

appropriate, and are provided by the appropriate provider.

22.     Providers can be required to refund any overpayments if they are found to have billed Medicaid contrary to law, failed to maintain records or documentation to support their claims, or billed for medically unnecessary services.

23.     The Virginia Medicaid program is administered by the Department of Medical Assistance Services ("DMAS").  Services must meet the requirements set forth in the Virginia State Plan for Medical Assistance Services and as set forth in Virginia law.  Providers shall document and maintain individual case records in accordance with state and federal requirements.  Various publications and resources are available to providers, including the *Community Mental Health Rehabilitation Services* ("CMHRS") provider publication which is the reference manual provided by DMAS that distills the Medicaid Statute into user-friendly sections relevant to mental health providers, such as Agape.

24.     Virginia law provides for on-site utilization reviews of community mental health services annually to determine, among other things, whether services were provided by appropriately qualified individuals and to ensure that delivered services as documented are consistent with the recipients' Individual Service Plans.  Those reviews are described in numerous places including but not limited to, 12 VAC 30-60-143.

25.     The absence of any required documentation may result in denial or retraction of any reimbursement.

26.     As a condition to participation in the Medicaid program, all providers are required to maintain and retain business and professional records that document fully and accurately the nature, scope, and details of the health care provided.  As part of this requirement to maintain records, providers have a duty not to forge or falsify records.  They also have a duty to repay any overpayments received.  Additionally, all providers have a duty to cooperate with DMAS when

DMAS audits such records by providing access to records and facilities, in the form and manner requested.

## Claims for Reimbursement of Mental Health Services

### Agape's Mental Health Services Process

27.     When an individual in the community is in need of mental health services and seeks mental health care from entities such as Agape, the procedure that used to be required until September 2010 was as follows:  an initial "assessment" is completed face-to-face by a Licensed Mental Health Professional ("LMHP") or by a Qualified Mental Health Professional ("QMHP") after which an Individualized Service Plan ("ISP") is drawn up by the LMHP or QMHP. As of September 2010, a QMHP can no longer perform initial assessments or reassessments.  An LMHP is someone who is licensed in Virginia as a physician, clinical psychologist, professional counselor, clinical social worker, marriage and family therapist, a psychiatric clinical nurse specialist or a psychiatric nurse practitioner.

28.     A QMHP is someone in the human services field who is trained and experienced in providing psychiatric or mental health services to individuals who have a primary or secondary psychiatric diagnosis.  For example, a mental health worker who has a bachelor's degree in human services or a related field from an accredited college with at least one year of clinical experience would be considered a QMHP.  Only direct face-to-face contacts and services by the LMHP or QMHP to individuals are reimbursable.  Therefore, if an Agape staff person, other than an LMHP or a QMHP, actually completed the assessment face-to-face, an LMHP or a QMHP could not simply "sign off" on the assessment for the unqualified individual.

29.     Agape bills Medicaid $91.00 for an intake assessment.  Unless an LMHP or a QMHP actually completes an initial assessment in person, that service is not reimbursable by Medicaid.

30.    After an intake assessment is completed, and once the actual ISP is developed, a Qualified Paraprofessional in Mental Health ("Qualified Paraprofessional") may provide counseling services under the supervision of a QMHP.

31.    An example of a Qualified Paraprofessional is an individual who has an associate's degree in a related field, such as, social work, psychology, psychiatric or vocational rehabilitation or counseling, and has at least one year of experience providing direct services to persons with a diagnosis of mental illness.  Mental health support services, which continue for six consecutive months, must be reviewed and renewed at the end of the six-month period of authorization by an LMHP who must document the continued need for the services.

32.    Rather than adhere to the requirements promulgated by DMAS, Agape allowed unqualified employees to complete face-to-face assessments and reassessments, and nevertheless submitted these intakes to Medicaid for payment.

33.    Agape's practices were further exacerbated when DMAS announced new and more stringent requirements both as to which mental health professionals could conduct assessments, and as to new requirements to qualify as a QMHP.  On July 23, 2010, DMAS announced changes to Community Mental Health Rehabilitative Services, specifically Adult Oriented Services, to be implemented on September 1, 2010.  Effective September 1, 2010, the initial assessment and six month reauthorization "must be done face-to-face by the LMHP or a license-eligible mental health professional" and no longer could be conducted by a QMHP.

34.    DMAS also introduced more stringent requirements for staff persons defined as QMHPs but allowed six months (until March 1, 2011) for community mental health providers to come into compliance as to the qualifications required for QMHP.

35.     The category of License-Eligible Mental Health Professional ("License-Eligible

Professional") persons allowed to conduct initial assessments comprises those individuals who

have completed a graduate degree from a program that expressly prepares individuals to practice

counseling and counseling interventions as defined in §54.1-3500 Code of Virginia and in

18VAC115-20-49 *et seq.*, and who are under the direct personal supervision of an LMHP.

36.     The Virginia Board of Counseling requires that the individual and supervisor submit a

supervisory contract and receive board approval prior to the beginning of the supervised

experience.  For purposes of Medicaid reimbursement, these persons shall use "LMHP-E" after

their signatures to indicate this status.

37.     There is an overlap between DMAS and the Department of Behavioral Health and

Developmental Services ("DBHDS") in that it is necessary to be in compliance with DBHDS's

licensing process in order to be a Medicaid provider and render services.  All providers enrolled

in the Virginia Medicaid Program must adhere to the conditions specified by DMAS.  Providers

may bill Medicaid for mental health services only when the services are provided by the

appropriate qualified mental health professional.

38.     The wrongdoing in this case began when defendants billed government health programs

for services that were not eligible for payment, and were exacerbated when defendants chose not

to repay the money it had obtained from such payments even though those services were not

eligible for payment; instead, defendants forged documents and falsified records in order to

avoid having to repay money to government health programs.

39.     When DMAS introduced the new regulations in September 2010, requiring that only

LMHPs or License-Eligible Professionals could conduct initial assessments, Agape had only four

employees company-wide who could perform the face-to-face intakes:  Owner, Sherrie Mawusi;

Tiffany Dobbins, Coordinator for Mental Health Support; LaDonna Stone, Coordinator for

Intensive In-Home Services; and Marie Payne-Clore, Director of Agape's Culpeper location.

40.     With the prospect of only four employees legitimately qualified to do initial assessments,

the owners seized upon the "license eligible" qualification, stretching the category way beyond

its legitimate definition.

41.     According to the owners, being "license eligible" meant you were "working on it." In

their view any person who had mailed their licensing application to the VA Board of Counseling

was "working on it" and therefore eligible to complete intake assessments, whether they had

received a letter of approval from the Board or not.

42.     These employees were instructed to put the "LMHP-E" tag after their signature when

performing face-to-face intakes. But Agape's subsequent actions belied its rationalization as to

the employees truly qualified to perform assessments and reassessments.

43.     The practice at Agape is to keep all clients' files – active and inactive – in the file room at

the on-site Quality Assurance Department.

44.     In February 2012, owners Sherie Mawusi and Lena Baker-Scott began to request certain

files from Jennifer Jenkins, Director of Quality Assurance. David Wilson, Ms. Mawusi's

personal assistant, created a "File Check-Out Log" for both Mawusi and Baker-Scott.

45.     In August of 2012, Mrs. Phipps, who had by this time begun to suspect something was

seriously wrong with Agape's business practices, noticed the File Check-Out Log and the fact

that the clients' files on this list were those for whom assessments had been performed by

employees on her team who were "working on it" and who had not received a letter of approval

from the Virginia Board of Counseling.

46.    Mrs. Phipps learned that virtually all of defendants' treatment services from February 2012 through May 2012 were provided by unqualified employees.

47.    In May, 2012, the Agape owners instructed directors to ensure that all intake assessments, progress notes, quarterly reports, treatment plans, and termination reports were printed out and present in hard copy with a "hard signature" in each client's file in preparation for upcoming audits by "licensure" (DBHDS) and Medicaid.

48.    Relator informed her staff of this directive and then scheduled a "paperwork party" to assist her team with the onerous project. As she and her staff came together to print out documents and make sure the proper documentation was present in each client's file, Relator noticed an assessment apparently completed and signed by Marie Payne-Clore.

49.    Marie Payne-Clore is an LMHP and Director of Agape's Culpeper location, and would never have completed an assessment for a client assigned to Relator's team or caseload. Upon further examination of cases, Relator found more files containing assessments signed by individuals other than the persons she knew had completed them.

50.    Relator proceeded to make a list of such cases in order to protect herself since, as Director, she was responsible for her files and had not placed these documents in these clients' files, nor had she asked anyone else under her supervision to do so.

51.    In early June, 2012, Mawusi's assistant David Wilson began to present a stream of files to Mrs. Phipps as well as other directors at Owner Mawusi's directive, with sticky notes attached and instructions to "fix" this, "add" that or "change" something else. Not willing to change or alter documents, Mrs. Phipps would simply give the files back.

52.    On July 23, 2012, Mrs. Phipps sent an email to Owners Mawusi and Baker-Scott following up on the files she had been given to "change" stating that she was "extremely

uncomfortable with adding/changing/deleting names on intakes and/or reassessments...and even asking others to do this or sign off on them, when they in fact did not complete them. I know I have expressed this verbally as well."

53.     Mrs. Phipps was willing to change minor errors, such as an incorrect social security number, but she was at a loss as to what to do with the files that she had been given to "change." Mrs. Phipps did not receive a response to her July 23, 2012 email.

54.     Agape had a modus operandi with regard to "changes" it was requesting that its directors make to the files. The standard Adult Intake Assessment form that Agape uses for intakes is an electronic Word document. On the face of this document, which is to be utilized by LMHPs and License-Eligible Professionals during assessments, is a provision for "ACTS Staff Completing Assessment."

55.     One of the "changes" that Relator was requested to make was to remove the "ACTS Staff Completing Assessment" line as well as the name of the person who actually completed the assessment from the front of the form, and then print the altered assessment with a blank signature page so that a different person could sign it.

56.     These change requests were made for those employees who had completed assessments after the regulations were changed in 2010 but who were not qualified to do the assessments.

57.     Owner Sherie Mawusi, (who is qualified to do intakes as an LCSW), would "sign off" on assessments she never conducted.

58.     If Mawusi was not available, Ms. Phipps has personal knowledge that co-owner Lena Baker-Scott, a QMHP not an LMHP, would sign Sherie Mawusi's.

59.     The "signature" page was completed months, even years later, by Mawusi, Baker-Scott or an LMHP or License-Eligible Professional who had not in fact completed the assessment, and

then placed in a client's file. This practice was most prevalent before an audit as part of an

attempt to avoid repayment. For each client's file which contains an altered assessment or

reassessment, the Record Review Chart Checklist form is missing from that file because this

form would contain the names of the employees who completed the assessment and/or

reassessment. The contents of this document would have been "handwritten" so it would not

have been possible to change forms electronically and print out blank signature pages.

60.     The licensure audit took place at the end of June, 2012, and due to numerous errors,

DBHDS renewed Agape's license for one year rather than the customary three year period.

61.     The Medicaid audit was potentially expensive for Agape, despite efforts to get its files in

order. For example, just one missing reassessment from a client's file resulted in over $13,000

of payments selected to be retracted by Medicaid which would represent six months of treatment

following when the reassessment justifying further treatment should have been performed and/or

documented in the client's file. Also, Auditor Candice Chavis "did not like" what she found at

the Culpepper location, and informed Agape that she would be returning for further auditing in

September, 2012.

62.     While Agape was being audited by Medicaid, Mrs. Phipps was presented with a sampling

of her files which showed that Medicaid was billed for units that were not substantiated in the

documentation Mrs. Phipps had presented to the billing administrator.

63.     Each "unit" represents one hour of staff-to-client time. The extra units were added, but

not by Mrs. Phipps. Upon review of her progress notes and billing sheet, Mrs. Phipps found that

the extra units were not part of the original documentation she had submitted to the billing

administrator, and therefore she did not dispute the auditor's finding.

64.     In July, 2010, billing manager Teisha Sparrow instructed Mrs. Phipps to stop tracking units; Mrs. Sparrow further said that she would let Mrs. Phipps know if she was close to maxing out on the 372 units allowed per fiscal year. Mrs. Phipps was puzzled as to why some of her clients would "run out of units," but now she realizes that Medicaid was being billed beyond the services Agape was providing.

65.     Pursuant to § 32.1-325.1 of the *Code of Virginia*, DMAS is required to collect identified overpayments.

66.     In early September, 2012, in the face of an audit to be conducted by Medicaid's contractor, Healthcare Management Systems ("HMS"), Mrs. Phipps approached Djuana Edgar-Robinson, Director of Operations, to see if some of the files requested by HMS to be audited had reassessments that had just not been printed out. The Intake Coordinator, Joy Lewis, was on vacation at this time but Ms. Edgar-Robinson directed Mrs. Phipps to a USB stick on the intake coordinator's desk so that she could search for the document.

67.     Mrs. Phipps saw that all of the assessments and reassessments completed throughout Agape were contained on this flash drive and organized into files according to the person who had originally completed the intake or reauthorization. Employees throughout Agape submit their work, including assessments, to the intake coordinator Joy Lewis for placement in Agape's centralized client filing storehouse.

68.     Thus, regardless of the signatures on the hard copies of documents which appear in clients' files, it is possible to trace the original author of the documents. On October 5th, 2012, Mrs. Phipps was approached about the subject of Kendra Artis's files. Ms. Artis is a former employee who had worked on Relator's team who, during a Medicaid audit in 2010, was identified by the auditor as being "unqualified" to perform assessments, which would mean at that time Ms. Artis was neither an LMHP nor a QMHP.

69.     Several weeks after the audit in 2010, the owners informed Mrs. Phipps that they "found something" in her file which made her eligible to conduct assessments, and that was the last Mrs. Phipps heard of the incident. Mrs. Phipps knew that Agape had to potentially reimburse Medicaid at least $300,000 due partially to Artis' lack of qualification for the 2009 audit. Nevertheless, Mrs. Phipps was given the directive by Mawusi to "go get the files that Kendra did assessments on and get electronic copies of them and take Kendra's name off, and print out and bring to owner for signature." The list HMS provided for anticipated review included a total of twenty assessments Kendra Artis had completed that Mawusi wanted reprinted and altered from their original form.

70.     Mawusi had the front page of the assessments altered electronically so as to remove the line providing for the name of the person conducting the assessment. Then, she or another otherwise "qualified" person would sign that assessment on the final page. In some cases, the final page was replaced. In other cases, it was signed for the first time in hard copy. In some cases where Agape had not been in compliance with having the required documents in clients' files, the assessments were being printed out for the first time, months or even years later. The assessments in question were then signed by somebody other than the person who completed them.

71.     Another Director, Alonzo Sparrow, knowing of Mrs. Phipps' aversion to altering documents or "signing off" on assessments she did not conduct, approached her several times and said that Mrs. Phipps should just hand the files over to him and he would "take care of it," or words to that effect. What Mr. Sparrow meant was that he would alter the files because he knew that Ms. Phipps would not do so.

72.     On Monday, October 8, 2012, the morning the audit with Medicaid's contractor, HMS, was to begin, Mrs. Phipps witnessed Djuana Edgar- Robinson, Director of Operations, sign all of Ms. Artis's assessments.  Mrs. Edgar-Robinson is a QMHP but because Ms. Artis's assessments took place before September 2010, she would have been qualified to do the initial face-to-face assessment.  Since September 2010, neither Mrs. Edgar-Robinson nor Mrs. Phipps, herself a QMHP, are qualified to do initial face-to-face assessments.

73.     In addition, five old assessments were falsified and placed in the clients' files prior to giving the files to the HMS auditors on October 8th, 2012.  Jennifer Jenkins and Ms. Edgar-Robinson were responsible for creating these documents after Mrs. Phipps refused to participate.  Owner Baker-Scott signed all of these assessments as Sherie Mawusi.

74.     Without a valid assessment or reassessment, the entire course of treatment that follows cannot legally be billed to Medicaid; and if they are billed, those monies must be repaid.  According to Mrs. Phipps' calculations, the amount in Medicaid payments represented by Ms. Artis's clients' files alone, with assessments, reassessments and treatment, amounts to over one million dollars.

75.     On October 19, 2012 during a Director's meeting, Owner Mawusi said, "We created this mess.  Decisions we have made in the past have led us to where we are today.  We apologize.  We might not be good on paper but we are moving towards excellence," or words to that effect.  Mawusi was referencing the above-alleged acts when she made this comment.

## ACTS OF RETALIATION AND DISCRIMINATION AGAINST RELATOR BY AGAPE IN VIOLATION OF VIRGINIA CODE § 8.01-216.8 AND FEDERAL FALSE CLAIMS ACT § 3730(h)

76.     Through the months and years in her work as a Director, owner Sherie Mawusi would periodically give Mrs. Phipps files to "correct" and Mrs. Phipps would go through her long-standing routine of giving the files back upon which she had taken no action.  Meanwhile, at staff meetings, she is told that she is "not a team player" and as a result when Mrs. Phipps is in need of supplies, she does not receive them like the other directors do.

77.     Defendants made thinly veiled threats directed at her employment and broad hints that it would be in her interests to cooperate with defendants' schemes.

78.     For example, Mawusi said to Mrs. Phipps that "Some people have had babies [and thus really needed their jobs with defendants]."  Because Mrs. Phipps gave birth in 2011 she took this to be a direct reference to herself.

79.     Mrs. Phipps was also told by Owner Baker-Scott that "Some people have lost their jobs [and thus really needed a second income from a working spouse]."  Because Mrs. Phipps' husband had recently lost his job when this comment was made, Ms. Phipps took this to be a direct threat to her employment.

80.     These comments and others were intended to infer that such circumstances should cause Mrs. Phipps to "cooperate" more at Agape.  Mrs. Phipps is frequently "cold shouldered" and feels that the pressure is rapidly increasing as Agape finds itself in escalating legal trouble.

81.     Defendants knew that their conduct was unlawful, because when they were confronted with the falsity of their actions, they chose to forge records and conceal material information in order to avoid having to repay money to DMAS.

82.     As of January 10, 2013, Mrs. Phipps knows, for example, that there are 275 files checked out by Directors from the file room needing to be "fixed;" therefore the illegal and unjust activities continue to this day unabated.

## Count I

### False Claims Act 31 U.S.C. §§ 3729(a)(1)(A), (B)

83.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 82 of this Complaint.

84.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

85.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to approve and pay such false and fraudulent claims.

86.    Each claim for reimbursement submitted by defendants to a federal health care program for health care services that were not provided, or were provided by a person not licensed or qualified to provide such services, represents a false or fraudulent claim for payment.

87.    The Government, unaware that health care services were being provided by persons not licensed or qualified to provide such services, paid claims that would not have been paid but for defendants' illegal scheme.

88.    By reason of the defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## Count II

### Concealing Obligation to Pay Money to the Government

### 31 U.S.C. § 3729(a)(1)(G)

89.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 88 of this Complaint.

90.     By virtue of the acts described above, defendants knowingly made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

91.     Each instance of defendants avoiding an obligation to repay money to the Government, or of making or using false records or statements material to an obligation to pay money to the Government, represents a violation of 31 U.S.C. § 3729(a)(1)(G).

92.     Because of the actions of defendants, the Government was not aware that the defendants were creating false records in order to avoid repaying moneys that had been falsely obtained from the Government, and as a result, the governments failed to collect such moneys.

93.     By reason of the defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## Count III

### Conspiracy to Submit False Claims

### 31 U.S.C. § 3729(a)(1)(C)

94.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 93 of this Complaint.

95.     By virtue of the acts described above, defendants knowingly conspired to present or cause to be presented, false or fraudulent claims to the United States Government for payment or approval.

96.     Each claim for reimbursement submitted by defendants to a federal health care program for health care services that was the result of a conspiracy to solicit unlawful payment for

services reimbursed by federal health care programs represents a false or fraudulent claim for payment.

97.    The Government, unaware that health care services were being provided by persons not licensed or qualified to provide such services, paid claims that would not have been paid but for defendants' illegal scheme.

98.    By reason of the defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count IV

## Virginia Fraud Against Taxpayers Act

## Va. Code Ann. § 8.01-216.3(a)(1), (2), (3), (7)

99.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 98 of this Complaint.

100.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Commonwealth of Virginia for payment or approval.

101.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Commonwealth of Virginia to approve and pay such false and fraudulent claims.

102.    By virtue of the acts described above, defendants knowingly conspired to present or cause to be presented, false or fraudulent claims to the Commonwealth of Virginia for payment or approval.

103.    The Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid claims that would not have been paid but for defendants' illegal scheme.

104.    By virtue of the acts described above, defendants knowingly made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth of Virginia, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth of Virginia.

105.    Each instance of defendants avoiding an obligation to repay money to the Commonwealth of Virginia, or of making or using false records or statements material to an obligation to pay money to the Commonwealth of Virginia, represents a violation of Va. Code Ann. § 8.01-216.3(a)(7).

106.    Because of the actions of defendants, the Commonwealth of Virginia was not aware that the defendants were creating false records in order to avoid repaying moneys that had been falsely obtained from the Commonwealth, and as a result, the Commonwealth failed to collect such moneys.

107.    By reason of the defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against the defendants as follows:

1.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of $11,000 for each violation of the federal False Claims Act alleged above;

2.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained because of defendants' actions, plus a civil penalty of $11,000 for each violation of the VFATA;

3.      that Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provision of the Virginia statutes set forth above;

4.      that Relator be awarded all costs of this action, including her reasonably attorneys' fees and expenses;

5.      that Relator recover such other relief as the Court deems just and proper.

        Relator hereby demands a trial by jury.

Respectfully Submitted,
Lisa Phipps
By and Through her Attorneys


Zachary A. Kitts
Virginia Bar I.D. No.: 47052
Justin Gilbert
Virginia Bar I.D. No.: 74083
K&G Law Group, PLLC
3554 Chain Bridge Road
Suite 400
Fairfax, Virginia 22030
Phone: 703-649-5500
Fax: 703-649-6363
zkitts@kglawpllc.com


Margaret M. Looby
Virginia Bar I.D. No.: 79492
4444 Sanibel Circle, Suite 206
Virginia Beach, VA 23462
484-241-6020
margaretmlooby@gmail.com

Date: 3/12/13